UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LARRY D. CAMERON, | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) NO. 3:07-CV-008 PPS |
| DR. GERALD MYERS, M.D., | ) |
| Defendant. | ) |

## OPINION AND ORDER

In this case brought under Section 1983, prisoner Larry Cameron claims that his prison doctor, Gerald Myers, was deliberately indifferent to his medical needs by ignoring Cameron's many requests to continue his Remicade treatment for his Crohn's disease. Cameron claims that because his Crohn's was left untreated, it led to him contracting a painful and disfiguring flesh eating disease called Pyoderma Gangrenosum. Cameron properly served Myers with a summons and complaint, but Myers ignored the suit. Default was entered against Myers and after a damages hearing before the Magistrate Judge, a default judgment was entered against Myers. Myers now wants the default judgment vacated under Rule 60(b). He argues that his own medical condition, Attention Deficit Hyperactivity Disorder ("ADHD"), provides "good cause" for his failure to respond to the lawsuit until after judgment. I find that Myers has not met his burden of proving good cause under the stringent Rule 60(b) standard, and therefore his motion to vacate [DE 43] is denied.

## BACKGROUND

Cameron secured a default judgment based on his unopposed allegations surrounding his

lack of treatment for both Crohn's Disease and Pyoderma Gangrenosum while incarcerated in the Indiana State Prison ("ISP"). Cameron first entered the prison system by way of Lake County Jail. Prior to being incarcerated, his Crohn's disease was being controlled with Remicade, a treatment given by an infusion every eight weeks. While at the Lake County Jail, Cameron's Remicade treatments were continued on doctor's orders. *See* Dr. Nehme Medical Records [DE 24-2]. These treatments appear to have continued through June or July 2006, after which, he was transferred to the ISP and placed in the care of Dr. Myers. *Id*.

During his stay at the ISP, Cameron submitted fifteen separate health care requests and grievances pertaining to complications from his Crohn's disease and his desire to continue his Remicade treatment. Health Care Requests [DE 58-9] at 1-17. Cameron kept telling anyone willing to listen – including Dr. Myers – that the Remicade treatment was crucial to the control of his Crohn's disease. Yet Cameron received no Remicade treatments while in the care of Dr. Myers. Cameron further claimed that Myers' failure to provide him with Remicade caused him to suffer from Pyoderma Gangrenosum, described as a "flesh-eating disease" which produced excruciating physical pain. Magistrate Hearing Tr. [DE 49] at 11; Cameron Aff. [DE 24], ¶ 2-3. The medical literature supports the connection between Crohn's disease and Pyoderma Gangrenosum and the successful treatment of both with Remicade. *See* Thomas T. Provost, *Case of the Month: January's Diagnosis - Pyoderma Gangreonsum*, Vol. 3, No. 2 Johns Hopkins Advanced Studies In Medicine 116, 116-118 (Feb. 2003), *available at* http://www.jhasim.com/files/articlefiles/pdf/journal_p116(V3-2)MC_COM_diag.pdf. At the hearing to set aside the entry of default, I asked Cameron to show me his scars from the flesh eating disease. His legs were grotesque looking, having been badly scarred and discolored.

After exhausting his administrative remedies, Cameron filed this Section 1983 action against Myers on January 5, 2007. Complaint [DE 1]. Judge Sharp did the initial screening of the case under 28 U.S.C. § 1915A and allowed it to proceed against Dr. Myers on the Eighth Amendment claim the Dr. Myers was deliberately indifferent to Cameron's serious medical needs. [DE 6]. Cameron was transferred to the Pendleton Correctional Facility shortly after the complaint was filed. Once at Pendleton, Cameron was placed in the care of a Dr. Coots. Cameron Aff. [DE 24], ¶ 7. Dr. Coots instantly diagnosed Cameron for both Crohn's Disease and Pyoderma Gangrenosum, and then ordered the immediate resumption of the Remicade treatments. Dr. Coots Medical Records [DE 24-4]. Both conditions were resolved by May of 2007, but as noted above, without the Remicade, Cameron endured excruciating pain for a number of months and was left permanently disfigured in the process. Magistrate Hearing Tr. [DE 49] at 12.

Dr. Myers' signature appears on the returned summons. *See* Summons [DE 12]. Cameron credibly testified at the hearing and in an affidavit that he personally served Myers by handing the documents to a nurse and then watching that nurse give them to Myers in his office. Cameron Aff. and Proof of Service [DE 8]. The nurse then confirmed for Cameron that Myers received the summons and complaint. *Id*. Myers does not deny that it is his signature on the summons, only that he does not remember receiving or signing it. Def.'s Br. [DE 43] at 4. Without any answer or response from Myers, the clerk entered default under Rule 55(a). Magistrate Judge Nuecheterlein then held a damages hearing and issued a report and recommendation finding Myers liable for his deliberate indifference to Cameron's serious medical needs and recommended a damages award of $250,350.00. Report and Recommendation [DE 30] at 8-9. I then adopted the Magistrate's Report, and a default judgment was therefore entered. July 18,

3

2008 Order [DE 33]; Clerk's Entry of Judgment [DE 34].[1]

It was not until after receiving word of the default judgment that Myers responded to the lawsuit. He attributes his lack of memory regarding his receipt of the summons and complaint, along with his failure to respond to the lawsuit, to his ADHD. Myers Aff. [DE 43-2], ¶¶ 18-20. Myers had been taking medication to treat his condition since 2002. Dr. Sonego, the physician treating him for his ADHD, submitted a letter to the Court briefly describing Myers' medical history and the effects ADHD can have for individuals with regard to task completion, focus, and attention to details. Dr. Sonego Letter [DE 43-7]. At the hearing held on his motion to vacate default judgment, Myers explained that his ADHD does not affect his ability to treat patients competently. He stated that the creation of reminders and other help from his staff "usually makes things flow fairly well." Myers testified that he likely received Cameron's summons and complaint but probably set them to the side, perhaps in his car, and then simply forgot about them. He admitted that he did not attribute as much importance to it as he should have. In fact, Myers candidly admitted that he viewed this type of correspondence – being that it came from a prisoner – as "pretty much a nuisance."

Dr. Myers graduated from the University of Illinois College of Medicine in 1972, and he was licensed to practice medicine in Indiana in 1975. He began working for the Indiana Department of Corrections in 2003. Despite his ADHD, Dr. Myers continued to see patients since he was diagnosed with the ailment and has continued to perform his job as a physician without incident. Indeed, Myers testified that he has never been in trouble with the Indiana

---

[1] After the Clerk's Entry of Default, the case was reassigned from Judge Sharp to me. [DE 25].

licensing authorities and has never had a judgment against him relating to the practice of medicine.

As to the merits of the claim, Myers argues that he wasn't deliberately indifferent to Cameron's medical needs and that he made the correct medical decision when refusing to provide Cameron with Remicade. He says that he was concerned with possible side effects the Remicade would have on Cameron's skin lesions, and wanted to see those improved before re-continuing the Remicade treatment. Myers Aff. [DE 43-2], ¶ 13.

## DISCUSSION

Under Rule 60(b)(1), relief from judgment (including a default judgment) may be given for "mistake, inadvertence, surprise, or excusable neglect." By contrast, Federal Rule of Civil Procedure 55(c) governs relief from a clerk's entry of default. It provides that "[f]or good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." The Seventh Circuit has adopted a three-prong test in considering motions to vacate entry of defaults and default judgments which requires a defaulting party to demonstrate: (1) good cause for its default, (2) quick action to correct the entry of default, and (3) a meritorious defense to plaintiff's complaint. *See e.g., O'Brien v. R. J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1401 (7th Cir. 1993).

The above stated test is the same whether a party is moving to set aside the entry of default under Rule 55(c) or moving to vacate a default judgment under Rule 60(b). *See*, *e.g.*, *United States v. DiMucci,* 879 F.2d 1488, 1495 (7th Cir.1989). Importantly, however, the standard is applied in a more stringent way when a default judgment has been entered. This is sensible because of the importance of "finality" that go along with judgments. *Jones v. Phipps*, 39

F.3d 158, 162 (7th Cir. 1994). In the context of a motion to vacate a default judgment, a party must show "something more compelling than ordinary lapses of diligence or simple neglect. . . ." *Id.* In other words, to vacate a default judgment, the defaulting party must surmount a "high hurdle." *Id*. So in contrast to the "liberally applied" test used for Rule 55(c), *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 630-31 (7th Cir. 2009), relief under 60(b) is an "extraordinary remedy," and only given in "exceptional circumstances." *McCormick v. City of Chicago*, 230 F.3d 319, 327 (7th Cir. 2000) (quoting *Dickerson v. Board of Educ. of Ford Heights, Ill.*, 32 F.3d 1114, 1116 (7th Cir. 1994)).

Typical reasons held up in this circuit and elsewhere as bona fide excuses under Rule 60(b) include illness, incarceration, and lack of access to legal counsel. *See Jones*, 39 F.3d at 163-64 (collecting cases)(citing *Klapprott v. United States,* 335 U.S. 601 (1949), *United States v. Forty-Eight Thousand, Five Hundred Ninety-Five Dollars,* 705 F.2d 909, 913 (7th Cir.1983); *Hicks v. Secretary of the Air Force,* 594 F.Supp. 690, 691 (D.Me.1984)). Other valid excuses include misrepresentations by judicial officers, lost mail, or plausible misinterpretations of ambiguous rules. *See Casio Computer Co., Ltd v. Noren*, 35 Fed.Appx. 247, 250 (7th Cir. 2002)(citing *Prizevoits v. Ind. Bel Tel. Co.*, 76 F.3d 132, 133 (7th Cir. 1996)).

Since a default judgment has already been issued in this case, we are well beyond the permissive Rule 55(c) standard and are instead governed by the more stringent requirements of Rule 60(b). The evidence that Myers offers to show excusable neglect is far from persuasive. He points to his ADHD as the reason for his default, claiming his condition affects his ability to focus on and complete tasks. While acknowledging that it is his signature appearing on the summons, he states that he has no memory of receiving the document and that he likely set it down and

6

forgot about it.

For starters, there is simply no authority supporting the proposition that forgetfulness attributed to ADHD can amount to excusable neglect under Rule 60(b).[2] Although there certainly may exist the case of such crippling ADHD so as to entitle a plaintiff to vacate a default judgment, this is not that case. Myers' evidence of the limitations created by his ADHD is underwhelming. It consisted mainly of a short letter from Myers' own physician, Dr. Sonego, who stated that he had treated Myers for ADHD for several years. Sonego Letter [DE 43-7]. He also said, quite generally, that "individuals with ADHD may continue to have functional difficulties with task completion, focus, and attention to details." *Id*. But as to Myers' specific complications from ADHD, Dr. Sonego simply stated that "[i]t is conceivable that Dr Myers' failure to respond ... could have been due, in part, to his underlying difficulty with attention and concentration." *Id*. This evidence does not paint a compelling picture of the sort of difficulties Myers faces day-to-day and it leaves me with little to extrapolate as to why responding to a lawsuit was any more difficult for him than any other normally functioning person. In any event, Dr. Sonego' letter suggested that Myers' ADHD was under control through medication which has been "effective for Dr. Meyers' ability to maintain task completion and focus, particularly in the workplace, where structure in his work with allied health professionals was also helpful." *Id*.

Myers' own affidavit and hearing testimony were equally unavailing. He was relatively silent as to specific episodes showing the effect of his ADHD and offered nothing in the way of

---

[2] In fact, albeit in a different context, the Eighth Circuit in *Stalney v. Lockhart*, 941 F.2d 707, 710-11 (8th Cir. 1991) rejected a prisoner-plaintiff's excuse for procedural default in part *because* of evidence showing he merely had attention deficit disorder, as opposed to the more debilitating schizophrenia condition he claimed to suffer from.

parallel stories demonstrating his difficulties in completing tasks analogous to the one presented to him by his receipt of Cameron's summons and complaint. *See* Myers Aff. [DE 43-2], ¶¶18-20. Rather than proving that his ADHD likely caused his failure to respond to the lawsuit, his testimony convinced me that he instead made the conscious decision to treat the documents with less seriousness than they deserved. Myers admitted that he is not only the main medical official charged with overseeing the medical needs of a prison system containing over 2,400 inmates, but is also given "administrative responsibilities as their medical director." Why responding to a prisoner lawsuit is any more difficult than performing these administrative responsibilities escapes me.

Dr. Myers further testified, like his treating physician, that his ADHD medicine keeps his condition in check, and that he was taking it at the time the complaint was served. Myers distinguished his type of ADHD from the "hyperactive" sort that creates "quite a burden in the daily life." All in all, Dr. Myers demonstrated that, as long as he maintained an awareness of his ADHD and the problems it could bring, he had more than the necessary tools to deal with it accordingly. If remembering to answer the lawsuit required something as simple as jotting down a note to himself or tying a string around his finger, I am certain he could have and should have done it.

Myers further testified that as a prison doctor he is often handed legal documents concerning prisoner complaints and that these lawsuits, in his own words, are "pretty much nuisance[s]." Based on this, he hypothesizes (without remembering directly) that he placed the summons on the front seat of his car and promptly lost it. Deciding that a summons is a "nuisance" and improperly casting it aside is a very different matter from ignoring it because of a

mental condition or handicap. He admitted that he received summonses and complaints in the past that he had to sign for and that he had never been in default in any of those cases. And in this case, his ADHD certainly did nothing to prevent him from calling his attorney immediately upon receiving a copy of the final judgment against him. Myers even stated, when asked how the ADHD may have affected his ability to respond to the suit, that "I'm not excusing my actions." While perhaps just a figure of speech, it emphasizes that he has not met his burden to prove that the cause of his default was "excusable neglect" as opposed to simply a poor decision made despite accessible information and legal assistance. To be frank about it, Myers' overall demeanor on the stand conveyed a strong impression that even he did not believe that his ADHD was the cause of his default.

Myers maintains that he is able to overcome the ADHD in his work environment because he has the mechanisms in place to combat his inattentiveness, such as staff members who help him keep track of appointments. But he says that outside of the clinical setting, his ability to focus on and complete tasks is not as strong.[3] But along with failing to prove that the ADHD affected him in his personal life in the manner he describes, Myers' argument is self-defeating because he received the summons at work. Cameron states that on February 23, 2007 at 10:35 a.m., he handed a nurse the summons and complaint and witnessed that same nurse hand the documents over to Myers while in his office. Cameron Aff. and Proof of Service [DE 8], ¶¶ 1-2. Myers offers no competing account as to how his signature may have ended up on the summons.

---

[3] In his brief, Myers states that his ability to focus was further compromised by his coronary ischemia, a heart condition that was diagnosed and treated in 2007. Def.'s Br. [DE 43] at 4. But he offers no evidence, not even a treating physician's letter, in corroboration with this theory. Furthermore, Myers testified at the hearing that he did not "honestly" believe that the coronary ischemia was a factor.

Therefore, I can only conclude that he did receive the summons at work, where the mechanisms were in place to guard against the complications arising from his ADHD. The fact that Myers indicated that he receives many of these sorts of legal notifications demonstrates that they were incorporated into his work routine and that he was fully capable of responding to them despite his attention problems.

In sum, although the excusable neglect standard used for vacating default judgments under Rule 60(b) is, as the Seventh Circuit described it, "justifiably vague," the defendant must at least show "the absence of any willful disregard for duties, simple carelessness, or negligence before a default judgment will be vacated." *Jones*, 39 F.3d at 158. Myers' depiction of his reason for default, that he put the summons to the side and forgot about it, strikes me as the epitome of simple carelessness. Allowing this as a reason to vacate a default judgment would ignore the important distinction between the "high hurdle" posed by Rule 60(b) motions to vacate default judgments on the one hand with the lower standard to vacate entries of default under Rule 55(c), on the other. In the end, I am sympathetic with Dr. Myers' plight of being saddled with a large judgment without being able to defend himself. But unfortunately his own carelessness is what led to the predicament.

Because Myers has failed to show good cause for the default, I need not analyze in detail whether he had a meritorious defense and whether he acted quicky enough in responding to the default. I will note though that Myers would have had a couple of things going against him had he actually presented a defense. To begin with, it appears that Cameron had a fairly strong case notwithstanding the fact that usually the cards are stacked against inmates trying to establish deliberate indifference on the part of prison officials. The timing paints a telling story. Prior to

10

his time with Dr. Myers, and while at the Lake County Jail, Cameron was being treated with Remicade and it was controlling his Pyoderma Gangrenosum. Then, as soon as he came under the care of Dr. Myers, he stopped receiving the Remicade treatments and immediately suffered through pain and disfigurement. He filed fifteen separate grievances that did not result in the re-continuance of the Remicade. Finally, he was transferred to a new correctional facility and a new doctor, who without delay put him back on the Remicade, causing the Pyoderma Gangrenosum to subside at once.

Myers' second problem is that he has painted himself into a bit of a corner. As discussed, I am not convinced that his ADHD provided good cause for his default. But if I had been persuaded, that would mean that Myers had successfully established that his ADHD condition significantly impaired his concentration, attentiveness, and ability to focus. But these were the very traits he would have needed to both practice good medicine and to avoid being labeled deliberately indifferent. Specifically, Myers would have to show that he did not simply give a cursory glance to Cameron's medical history, which documented the successes Cameron enjoyed using Remicade to battle Crohn's Disease and Pyoderma Gangrenosum, and that instead his choice to discontinue the Remicade was an informed and sound medical decision. With over 2,400 prisoners at the ISP, it is unclear how his ADHD could have compromised Myers to the point of causing him to ignore the lawsuit, but left him capable enough to carefully screen and correctly evaluate one of the many patients he was seeing at that time, not to mention one with a particularly complicated medical history.

At the hearing to vacate the default judgment, Dr. Myers also claimed that there was fraud in obtaining the judgment. Through this reference I presume he seeks relief under Rule 60(b)(3).

11

Rule 60(b)(3) provides for relief from final judgment in the event of fraud, misrepresentation or misconduct by the opposing party. Myers claims that Cameron testified falsely at the damages hearing held before the magistrate judge by stating that he contracted the Pyoderma Gangrenosum because of Dr. Myers' failure to provide him the Remicade treatment. This is a fraud, claims Myers, because the records show Cameron had been diagnosed with Pyoderma Gangrenosum prior to his incarceration at ISP. Dr. Nehme Consultation Notes [DE 43-4] at 3.

At the post-default hearing on Dr. Myers' Motion to Vacate, it became clear that Cameron had experienced Pyoderma Gangrenosum before his incarceration. Indeed, Cameron testified that it would flare up at times but was effectively controlled when he was taking Remicade, and that it never got as extreme as when he was under the care of Dr. Myers. This certainly may have been a different gloss on the evolution of Cameron's condition than presented at the damages hearing, but Cameron never claimed that his time with Dr. Myers marked his first experience with the disease. A close look at the Magistrate hearing transcript reveals that Cameron was never actually asked when he first got Pyoderma Gangrenosum. Magistrate Hearing Tr. [DE 49] at 1-17. Cameron's affidavit for damages merely stated that the denial of Remicade resulted in an "outbreak" of the skin disease. Cameron Aff. [DE 24-2], ¶ 2. And indeed it did. At bottom, Cameron's failure to clarify that his bout with Pyoderma Gangrenosum while being treated by Dr. Myers was really a violent flare-up as opposed to a first-time contraction does not amount to a fraud or even a misrepresentation for that matter.

But even if Cameron had outright lied about when he first contracted disease, Myers would need to show more to obtain relief under Rule 60(b)(3). The rule requires a moving party to show that because of the fraud, misrepresentation, or misconduct, the party was prevented from

fully and fairly presenting its case at trial. *Tobel v. City of Hammond*, 94 F.3d 360, 362 -363 (7th Cir. 1996). Moreover, he must prove this by clear and convincing evidence. *Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir. 2008). In this case, had Cameron's full medical history been presented for the record, Cameron still would have obtained a default judgment. His unopposed allegations would have demonstrated that he suffered from terrible pain and disfigurement from Pyoderma Gangrenosum which would not have occurred but for Myers' deliberate indifference and failure to provide Remicade. What prevented Myers from presenting his case was not any misrepresentation by Cameron, but his own failure to respond to the summons and complaint. *See accord*, *Travelodge Hotels, Inc. v. Taurus Hotels Corp.*, 179 F.R.D. 569, 572 -573 (C.D.Ill.1998)(refusing to vacate default even though plaintiff misrepresented to court the date of service because defendant still had more than enough time to respond and present his case).

I will end on a note about damages. At the May 27, 2009 hearing on the motion to vacate, Cameron revealed to me the scars he received as a result of his untreated Crohn's and Pyoderma Gangrenosum. Cameron's scarring appears far more severe than run-of-the mill post-surgical scarring that one encounters from time to time. It does not take a licensed physician to see that Cameron's scars came from what could only have been a highly painful and traumatic experience. "Disfigurement" is not too strong a word to use. Along with the extensive physical injury and permanent scarring, Cameron suffered from mental pain as a result of his lengthy struggle to get Myers to take notice of his condition. He submitted fifteen requests for healthcare while incarcerated at the ISP, yet his pleas for Remicade and treatment for the Pyoderma Gangrenosum were ignored until he was transferred to another facility. *See* Health Care Requests [DE 58-9] at 1-17. The $250,350.00 award will justly compensate Cameron for his pain and suffering.

Punitive damages, which were rejected both by the magistrate judge and myself over Cameron's objections, are not necessary to further meet the goals of punishment and deterrence. *See* Report and Recommendation [DE 30] at 9; July 18, 2008 Order [DE 33] at 5.

## CONCLUSION

For the foregoing reasons, Myers' motion to vacate default judgment [DE 43] is **DENIED**.

Out of respect for the Stipulated Protective Order entered for this case [DE 53] and out of an abundance of caution, the clerk is **DIRECTED** to keep this order **UNDER SEAL**. However, the need for confidentiality is not readily apparent to me, and I note the Seventh Circuit's strong reluctance towards sealing documents outside of situations called for by specific statutes or privileges. *See United States v. Foster*, 564 F.3d 852, 853-55 (7th Cir. 2009); *Milam v. Dominick's Finer Foods, Inc.*, _ F.3d __, 2009 WL 147394, at * 2 (7th Cir. May 27, 2009). I will also point out that the hearing held on Myers' Motion to Vacate was done so in open court, to noone's objection. Accordingly, the parties are given until June 26, 2009 to provide the Court with compelling reasons as to why this order should remain under seal, otherwise the clerk will be directed to unseal the document.

**SO ORDERED**.

**ENTERED**: June 18, 2009

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
